# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|                                          |     |                    |
|------------------------------------------|-----|--------------------|
| ERIC BROWN,                              | )   |                    |
|                                          | )   |                    |
|     Plaintiff,       | )   |                    |
|                                          | )   |                    |
| vs.                                      | )   | NO. CIV-11-856-D   |
|                                          | )   |                    |
| USA TRUCK, INC. and JIMMY WATKINS,       | )   |                    |
|                                          | )   |                    |
|     Defendants.      | )   |                    |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

I. Background:

Plaintiff Eric Brown ("Brown") brought this action to recover damages for injuries allegedly sustained in an August 28, 2009 accident in which Brown's parked tractor-trailer was struck by a tractor-trailer driven by Defendant Jimmy Watkins ("Watkins"). As explained in more detail herein, while attempting to park his tractor-trailer, Watkins backed into Brown's vehicle. At the time, Watkins was employed by Defendant USA Truck, Inc. ("USA Truck"), and both defendants admit that Watkins was acting within the scope of his employment when the accident occurred. Watkins also admits that he was at fault, and there is no dispute that USA Truck is liable for any damages that may be awarded to Brown. The disputed issues involve the extent to which Brown was injured as a result of the accident and the amount of damages that are properly recoverable.

Brown alleges that Watkins's negligence caused serious injuries, resulting in pain and emotional distress, requiring extensive medical treatment, and rendering him unable to work in any capacity. In addition to claiming damages for past medical expenses, pain and suffering, and lost earnings, he seeks damages for both future medical and psychological care and lost income.

Although Defendants agree that Brown may recover reasonable damages for expenses

related to injuries caused by the August 28, 2009 accident, they contend his requested damages are excessive.  They argue that a substantial portion of his claimed damages are not based on injuries caused by the accident, but result from injuries sustained in a later unrelated incident.  They also contend that some of the requested damages are based on alleged current physical impairments which were not sustained in or exacerbated by the accident, but result from the natural consequences of age.  Additionally, Defendants argue that Brown's requested future damages for both medical treatment and lost income are speculative and not supported by a preponderance of the evidence.

At the parties' request, the Court conducted a non-jury trial.  Prior to trial, the parties submitted stipulations of fact.  *See* Amended Final Pretrial Report [Doc. No. 70], at ¶ 3. Commencing on  April 22, 2013, the Court conducted a five-day trial.  The Court heard the testimony of numerous witnesses, including expert witnesses, and admitted extensive exhibits. Prior to trial, the parties designated additional testimony to be presented by deposition. Although some deposition testimony was received during trial, with the  parties' consent  the Court reviewed some of the transcribed and videotaped depositions after the conclusion of testimony during the trial. Following the trial, the parties submitted amended proposed findings of fact and conclusions of law.

Having reviewed the evidence and the parties' legal arguments,  the Court finds and concludes as follows.

II. Factual Record Before the Court:

A. Stipulated facts:

Prior to trial, the parties stipulated to the following facts, which are conclusively found:

At all relevant times, Watkins was an employee of USA Truck, and was working within the scope and course of his employment at the time of the August 28, 2009 accident.

Brown drove the following truck driving trips for Rush Trucking Company between January 27, 2010 and March 9, 2010:

| DATE | TO | FROM | MILEAGE |
|------|-----|------|---------|
| 01/30/10 | Claycomo (Mo.) | Nogales (Az.) | 1221[1] |
| 02/01/10 | Nogales | Claycomo | 1221 |
| 02/08/10 | Nogales | Claycomo | 1221 |
| 02/13/10 | Claycomo | Nogales | 1221 |
| 02/16/10 | Nogales | Claycomo | 1221 |
| 02/19/10 | Claycomo | Nogales | 1221 |
| 02/21/10 | Nogales | Claycomo | 1221 |
| 02/26/10 | Claycomo | Nogales | 1221 |
| 03/01/10 | Nogales | Claycomo | 1221 |
| 03/07/10 | Claycomo | Nogales | 1221 |
| 03/09/10 | Nogales | Claycomo | 1221 |

On March 9, 2010, Brown completed his last trip, from Nogales, Arizona to Claycomo, Missouri.

Brown filed an occupational accident claim following an incident on March 9, 2010.

Brown's summary of medical expenses accurately reflects the services and the amounts billed for services he has received since August 28, 2009. The amounts of the claimed medical expenses are reasonable for the services provided.  However, the defendants do not agree that any of these services were necessary, or that any of the services or charges result from the August 28, 2009 motor vehicle accident.

B. Trial evidence and post-trial evidentiary submissions:[2]

The evidence reflects Brown's background and involvement in the trucking business prior

---

[1]The parties' stipulation in the Amended Pretrial Report [Doc. No. 70] lists this mileage as 1211 instead of 1221. The Court assumes the 1211 miles listed for January 30, 2010 contains a typographical error, as all other mileage for the same trip is 1221.  The Court has changed that portion of the stipulation accordingly.

[2]Certain deposition testimony and related exhibits were submitted to the Court as directed for consideration following the taking of in-court testimony.

to the August 28, 2009 accident.  According to Brown, he has an eighth-grade education; he may

have completed a high-school equivalency examination ("GED"), but is uncertain that he did so.

After working in various jobs, he decided to pursue a career as a commercial truck driver.  Brown

trial testimony (hereinafter "Brown tr. test.").  He graduated from truck driving school in 2000, and

obtained a commercial driver's license.  Thereafter, he worked as a truck driver for several

companies.  *Id.*  At the time of the accident at issue, Brown was 41 years old.

In January of 2008, Brown and his longtime companion, Diana Webster ("Webster"),[3]

acquired title to a 2005 Freightliner Tractor.  Webster paid for the tractor-trailer in part by obtaining

a second mortgage on her home and a line of credit.  Webster tr. test.  The resulting cost, with

financing charges, was approximately $82,626. *Id.*  Brown and Webster formed a company,

Crosswinds Trucking ("Crosswinds"), for the purpose of working as owner-operators.  Initially, both

were drivers, but Webster stopped driving when she was diagnosed with diabetes.  Brown then

became the only driver for Crosswinds.  Brown and Webster tr. test.  Webster was in charge of

maintaining all documents and records for Crosswinds.  Brown and Webster lived together in

Webster's home in Plattsburg, Missouri.  *Id.*

In August of 2009, Crosswinds applied to Rush Trucking Corporation ("Rush") to become

an independent contractor for Rush, with Brown acting as an owner-operator/truck driver.  Plaintiff's

Ex. 7.   Effective  August  25, 2009,  Brown,  doing  business  as  Crosswinds,  entered  into  an

Independent Contractor Service Contract.  Plaintiff's Ex. 14.  This contract was in effect at the time

---

[3]Webster was initially also a plaintiff in this lawsuit, and she sought recovery of damages on her own behalf.
Prior to trial, however, she dismissed all her claims against the defendants. *See* Stipulation of Dismissal [Doc. No. 39].

of the August 28, 2009 accident underlying Brown's claims in this lawsuit.

In the application to Rush, Brown expressed a preference for a regular route between Claycomo, Missouri,  which is near his residence, and Nogales, Arizona.  *Id.* According to the testimony of both Brown and Webster, Brown hoped that his contract with Rush would result in three round trips between Claycomo, Missouri and Nogales, Arizona every two weeks, which Brown described as the equivalent of  three one-way trips per week, for a total of 3,663 miles per week. There is no evidence that Rush guaranteed this particular route or amount of work.  The  Rush contract does not specify or guarantee the number of future trips to be completed by Crosswinds, and does not specify a designated route.  Plaintiff's Ex. 14.

 On August 20, 2009, Brown underwent a required Department of Transportation physical examination to determine his physical condition and fitness to work as a truck driver.  No problems or abnormalities were reported. Plaintiff's Ex. 11.

On August 28, 2009, Brown made his first trip for Rush, driving from Claycomo to pick up a load in Frederick, Oklahoma and return it to Claycomo.  Brown tr. test.  The August 28 accident occurred while Brown was returning to Claycomo from Frederick.  Brown and Webster tr. test.  He stopped for a rest break, parking his truck in the lot adjacent to Love's Country Store ("Love's") near Medicine Park,  Oklahoma.  At the time of the accident, Brown was asleep in the sleeping compartment in the rear of the truck's cab.  The compartment was separated from the driver/passenger area by a closed curtain; it contained a bunk-bed type structure, with a metal frame. Brown tr. test.

Watkins was driving a semi-tractor truck for USA Truck on August 28, 2009, and he also

stopped at the Love's parking lot for a rest break.  Brown's vehicle was parked when Watkins arrived. While attempting to park by backing into the space adjacent to  Brown's truck, Watkins backed into Brown's truck, striking the front driver's side.  The accident involved two similarly-sized vehicles.  Brown and Watkins tr. test.

Watkins admitted he backed into Brown's parked tractor-trailer and that he is solely responsible for the collision.  Watkins tr. test. He recalled that, when he first attempted to back into the parking space, he felt a bump and thought he had backed into the curb.  *Id*.  He then pulled forward and again attempted to back into the parking space, and felt another bump.  *Id.* At some point, he exited his vehicle and realized that he had hit another vehicle.  *Id.*

There is conflicting testimony regarding the number of times Watkins hit Brown's truck. According to Brown, Watkins backed his truck into Brown's truck three times.  Brown tr. test. Watkins was uncertain about the number of collisions, but he did not think he hit the truck more than twice.  Watkins tr. test. Officer Robert Chavez, the investigating law enforcement officer who interviewed  Brown and Watkins separately shortly after the accident, reported that both men told him that Watkins's vehicle struck Brown's vehicle three times.  Chavez tr. test. via video depo., transcript, p. 28, line 16- p. 31, line 21.  Officer Chavez prepared an Oklahoma Traffic Collision Report, and it states that Watkins struck Brown's vehicle three times.  Plaintiff's Ex. 19, p. 4.

Enrique Bonugli, a mechanical engineer who physically inspected Brown's vehicle after the accident at the request of Defendant's expert witness, Dr. Charles E. Bain, reported to Bain that the "observed damage pattern was also the result of two or possibly three impacts."  Bain tr. test. Plaintiff's expert witness, Steven Christoffersen, P.E., testified that photographs of Brown's vehicle

after the accident reflect damage consistent with at least two impacts, but he believes there were three impacts. Christoffersen tr. test.; photographs introduced as Plaintiff's Exs. 84, 85, 89.

There is evidence that Brown later told a medical provider that two impacts occurred, but he later reported to the Social Security Administration that four impacts occurred. Defendants' Ex. 23A, p. 18. Brown also reported that his tractor was pushed sideways approximately three inches by the impact or impacts of Watkins's vehicle. Defendants' Ex. 29E, p. 111. He testified that his tractor was pushed both backwards and sideways. Brown tr. test. The Court finds Officer Chavez's testimony regarding reports he received from Brown and Watkins at the scene to be fully credible, and the most reliable indication regarding the number of impacts with Brown's truck.

There was also conflicting testimony regarding the likely speed of Watkins's vehicle at the time of the impacts. Watkins testified that he was proceeding at an extremely slow speed in order to maneuver his truck into the space. The evidence shows that there was minimal physical damage to Brown's vehicle and no physical damage to Watkins's vehicle, and Watkins was likely to have been "riding" his clutch while reversing into a tight location. Defendants' Ex. 7, p. 11; Plaintiff's Ex. 47; Brown tr. test.; Watkins tr. test.; Dr. Bain tr. test. Plaintiff's expert witness, Steven Christoffersen, P.E., based his opinions regarding the force of the impacts on an estimated range of speed from 2.45 to 6 miles per hour. Christoffersen tr. test. If Watkins was braking or "riding" the clutch, the speed could be less than 2.45 miles per hour. Christoffersen did not base any opinions regarding the force of impact on a speed less than 2.45 miles per hour.

The evidence shows that, upon the initial impact, Brown was awakened from sleep and was disoriented. He testified that he stood up in the sleeping area and then, upon a second and third

impact, was thrown against the metal frame of the bunk with significant force. He described the resulting impacts as causing him to be thrown around the interior of the cab in a forward and backward direction as well as side-to-side.   He believes the extensive current physical problems he describes were all caused when his body struck objects or structures within the sleeping compartment as a result of these impacts.  Brown tr. test.

According to Officer Chavez, when he spoke with Brown shortly after the accident, Brown was somewhat disoriented because he had been sleeping, but he was able to comprehend Chavez's questions and provide clear answers.   Chavez tr. test.   Brown did not have visible injuries, and did not complain of  injury or pain; Chavez thought his main concern was whether his truck was damaged.  *Id.*  Emergency medical personnel who were called to the scene described Brown as "badly shaken up from sleeping."  Plaintiff's Ex. 20, p. 110.  Although they offered to transport him to a medical facility for examination, he refused treatment.  *Id.*  The only medical treatment provided to him was a bandage on a small cut in the area of his upper right shoulder.   Brown tr. test.; Chavez tr. test.

Officer Chavez  noted the damage to Brown's vehicle, which included a bent front bumper. Chavez tr. test.  He and others assisted Brown in bending the bumper so that it could be safely steered. *Id.*   There was also damage to the casing around a headlight on the driver's side, but the light was operating.  *Id.*  There was no visible damage to Watkins's vehicle.

Brown testified that he telephoned Webster to inform her of the accident.  He then went to a nearby restaurant and bar, where he had dinner and drank a beer.  Watkins was also at that location, and he offered to buy Brown a beer, but Brown declined.  Both Brown and Watkins

8

testified that Watkins repeatedly apologized to Brown for the accident, and Watkins assisted in bending the bumper on Brown's vehicle.    Brown and Watkins tr. test.

Brown slept in his vehicle that night and, the following morning, drove to Rush's location in Claycomo and then to his home in Plattsburg. Brown tr. test.  He was extremely sore the morning after the accident, and experienced increasing discomfort after he returned home.  He made an appointment for a medical examination with his regular physician, Jane Daffron, M.D., on the following Monday.[4]  Brown tr. test.

Dr. Daffron's records reflect that Brown told her he was sleeping in his truck when it was hit by another truck; he reported he was thrown backwards and hit his right shoulder and neck.  He told her that he had a headache, and pain in his neck, radiating down his right arm.  She diagnosed a muscle spasm, and prescribed pain medication and muscle relaxants.  She also ordered a cervical spine x-ray.  Plaintiff's Exs. 202 at p. 16 and 49 at p. 1.   The x-ray was performed on September 24, 2009, and was negative for cervical spine injury.  Plaintiff's Ex. 202, p. 47.  On October 2, 2009, a cervical Magnetic Resonance Scan ("MRI") was also performed.

After Brown complained of continuing pain in his right shoulder and numbness in his right arm, Dr. Daffron recommended physical therapy.  She also referred him to Dr. Clifford Gall, a board certified neurosurgeon, for examination.   Dr. Gall examined Brown on October 6, 2009.  Brown's only complaints at the time were pain in his neck, shoulder, and arm, with some weakness and numbness in his arm.  Dr. Gall tr. test. via videotaped deposition.  Dr. Gall reviewed the September 24 x-ray, and agreed it showed no cervical injury.  He also evaluated the October 2 cervical MRI,

---

[4]The accident occurred on a Friday night, and he returned home on Saturday.

and determined it also reflected no injury. Dr. Gall noted the MRI showed cervical degenerative disc disease, a condition common in individuals in Brown's age group; cervical disc degeneration is chronic in nature, and Brown's cervical condition did not result from an acute traumatic injury.   Dr. Gall videotaped tr. test., transcript p. 28 lines 18-25, p. 29, lines 1-8; p. 16, lines 2-6, p. 30, line 18 through p. 31, line 16; Plaintiff's Ex. 202, p. 48.

Dr. Gall also determined that Brown should undergo an electromyography ("EMG") examination, and Brown agreed.  On October 15, 2009, an EMG was performed by Dr. Salman Malik, a certified neurologist.  The purpose of the EMG is to determine whether nerve or muscle damage exists in the patient.  Dr. Malik tr. test.   According to Dr. Malik,  Brown's EMG was designed to determine the existence of such damage in the cervical spine and upper extremities. *Id.* Dr. Malik found no evidence that Brown had any abnormalities reflecting nerve or muscle damage. However, there was evidence of very mild borderline carpal tunnel syndrome in his left hand, and possible mild carpal tunnel syndrome in his right hand.  He also found indications of cervical disc degeneration, which he described as a chronic condition.  Dr. Malik tr. test.  He described cervical disc degeneration as an age-related condition.  According to Dr. Malik, the EMG did not show evidence of cervical radiculopathy.  *Id.*

Dr. Gall reviewed Dr. Daffron's records, and noted that the shoulder injection she performed had eased Brown's pain.  On or about October 19, 2009, Dr. Gall recommended that Brown have physical therapy, and Brown did so.   He began therapy at Liberty Hospital  Outpatient Rehabilitation on November 9, 2009.  Plaintiff's Ex. 202.  The therapists reported that Brown was cooperative and compliant with instructions, and Brown reported that the physical therapy was

helpful.  *Id.*

During a December, 2009 physical therapy session, Brown complained to his therapist about back pain; this was his first report of back pain, as his previous pain complaints were limited to his right shoulder and arm.  Plaintiff's Ex. 202, p. 16; Ex. 203, p. 57; testimony of Dr. Gall, p. 25, lines 3-6, 13-17, 23-25.  On January 7, 2010, Brown completed his physical therapy.

On January 12, 2010,  Brown  complained to Dr. Gall that he was having pain in his back, his right leg, and in the right side of his chest.  Dr. Gall tr. test., p. 25, lines 3-6, 13-17, and 23-25; Plaintiff's Ex. 202, p. 77.  This was the first report to a physician of pain in the back, and the first complaint of leg or chest pain.   Because this was a new complaint, Dr. Gall ordered a lumbar x-ray of Brown, which was completed on January 12, 2010.   The x-ray showed no acute thoracic compression fractures or subluxations.  Plaintiff's Ex. 202, pp. 52, 54.  Brown also had a lumbar MRI on January 12, and Dr. Gall noted the objective findings indicated degenerative disc disease in his lumbar region, a chronic condition which Dr. Gall described as consistent with what he would expect to see in an individual of Brown's age.  According to Dr. Gall, degenerative disc disease is not caused by trauma.  Testimony of Dr. Gall, p. 28, line 11 through p. 29, line 8; Plaintiff's Ex. 202, p. 53.  Defendant's expert witness, Dr. Bain, agreed with Dr. Gall that degenerative disc disease, a chronic condition, is typical of individuals in Brown's age group.  Dr. Bain tr. test.  On February 2, 2010, an x-ray of Brown's thoracic spine was performed, and the impression was unremarkable. Plaintiff's Ex. 202, p. 74.

Dr. Gall testified that, while degenerative disc disease does not always cause pain, it can do so.  It is also "common sense" that one having degenerative disc disease may have a greater risk of

developing a herniated disc, which typically causes pain.  Dr. Gall tr. test.  While trauma may be a cause of disc herniation, it is not the most common cause; in the majority of cases, the cause is unknown.  *Id.*

Dr. Gall believed that Brown's numbness and arm pain was likely caused by carpal tunnel syndrome rather than cervical radiculopathy.  When he received the results of the EMG performed by Dr. Malik, he confirmed that those results indicated carpal tunnel syndrome.   Dr. Gall agreed with Dr. Malik that the EMG showed no evidence of an acute pinched nerve or radiculopathy.  Dr. Gall saw no evidence of acute injury in Brown's EMG or other tests.  Dr. Gall tr. test.   According to Dr. Gall, an acute injury or trauma is one which has recently occurred, while a chronic condition has been in existence for months or even years.  Dr. Gall testified that the MRI showed a slight disc bulge, and he could not determine from his examination of Brown whether the small disc bulge was caused by trauma or it developed over time.  *Id.*  However, the slight disc bulge noted on the MRI would not cause the symptoms described by Brown.  *Id.*

When Brown complained of lower back and leg pain on January 12, 2010, Dr. Gall discussed with him the options of epidural steroid injections or surgery;  Brown chose the injections.  Dr. Gall tr. test.  During the January examination, Dr. Gall also noted Brown's lumbar and thoracic spine x-rays were normal.  *Id.*  At Brown's request, Dr. Gall released him to return to work on January 18, 2010.  Dr. Gall tr. test.

In addition to prescribing physical therapy, Dr. Gall referred Brown to Dr. Yuri Tsirulnikov, an anesthesiologist who specialized in pain management at the time.  According to Dr. Tsirulnikov, he first examined Brown on January 18, 2010, and met with him on six occasions through March

12, 2010.  Dr. Tsirulnikov tr. test. via video depo.

During the time period from the August 28, 2009 accident until January 27, 2010, Brown did not work.  During his initial August 31 examination, Dr. Daffron told him he was not to work for one week.  Brown tr. test.; Plaintiff's Ex. 202, p. 16.  That time period expired on September 7, but Brown did not return to work.  On or about October 1, 2009, Brown told Rush that he would be off work for six to eight weeks due to the August 28, 2009 accident.  Brown tr. test.  Although he testified at trial that Dr. Gall instructed him to remain off work during this time period, the evidence shows that Dr. Gall did not examine Brown until October 6, 2009, several days after Brown communicated his work restrictions to Rush Trucking.  Dr. Gall tr. test.; Brown tr. test.; Defendants' Ex. 4C at p. 81.  Rush required Brown to provide a medical release to return to work and, at Brown's request, Dr. Gall provided the release on January 17, 2010, releasing Brown to full active duty with no restrictions as of January 18, 2010.  Brown tr. test.; Defendants' Ex. 4C, pp. 52, 81.  Brown returned to work on January 27, 2010.  Brown tr. test.  Brown did not work for 152 days following the August 28, 2009 accident.

The evidence shows that, from August 28, 2009 to his return to work on January 27, 2010, Brown incurred more than $ 20,000 in medical expenses.  Summary of Plaintiff's medical expenses, Plaintiff's Ex. 70.  As of March 9, 2010, his medical expenses were $28,443.43.  *Id.*

On January 30, 2010, Brown completed his first trucking trip for Rush after returning to work.  *See* stipulated facts, *supra.* He made several trucking trips in February.  On March 2, 2010, Brown was examined by Dr. Tsirlunikov, to whom he reported that he was 60% improved overall; Brown rated his pain as a level 3 out of 10, with 10 being the most severe pain.  Dr. Tsirlunikov tr.

test., transcript at p. 67, lines 6-8, 23-25; p.68, line 1.  Dr. Tsirlunikov reviewed reports from

Brown's physical therapist, and these also reflected Brown was improving and had returned to work.

*Id.* at p. 68, lines 15-23.  According to Dr. Tsirlunikov, Brown had full range of motion in his right

upper extremity as of January 30, 2010.  *Id.,* p. 85, line 24 through p. 86, line 3.  Brown reported to

his physical therapist on March 3 that, measuring his pain on a scale of one to 10, with 10 being the

most severe, his pain was a level 1 at both the beginning and conclusion of his therapy session.

Plaintiff's Ex. 203, p. 191.

On March 7, 2010, Brown drove from Claycomo, Missouri to Nogales, Arizona.  During

his return trip to Claycomo on March 9, Brown injured his right shoulder while cranking or

"dollying down" the trailer on his vehicle.  He reported the incident to Rush and filed a claim with

his occupational accident insurance carrier, Great American Insurance ("Great American"),  on

March 16, 2010.  Webster prepared the necessary documents on his behalf, and reported to Great

American that, on March 10, 2010[5] Brown injured his right shoulder and arm while dollying down

the trailer during the course of his work for Rush.  Plaintiff's Ex. 202, p. 158.  Shawna Donovan of

Great American was assigned to the claim.  Donovan tr. test. via video depo., transcript at p. 14, line

23 through p. 15, line 1.  Donovan testified that Brown reported only an injury to his right shoulder

resulting from this work-related incident, and  Great American approved this as a work-related

injury.  *Id.* at pp. 19-20; p. 21, lines 19-25; p. 22, lines 1-6.

Phyllis Hunter of Great American testified by video deposition that she processed Brown's

---

[5]Although Webster listed the injury date as March 10, the parties agree that it occurred on March 9, 2010.  As noted, *infra,* the date was incorrectly listed as March 10 on some other medical records, and those appear to be based on Webster's apparent error in listing the date.  The error does not impact the findings or conclusions in this case.

claim for disability based on the March 9, 2010 injury to his shoulder. She testified that she reviewed the medical report from Dr. Haas regarding the injury. At the time, she was not informed by Brown that he believed the March 9 injury was an aggravation of a pre-existing injury, although there was a reference in some medical materials to an August 2009 accident. She reviewed Dr. Haas's medical records which stated that Brown advised him of the prior injury which was apparently resolved by March 9, 2010. Hunter tr. test. via video depo., transcript, p. 10, lines 9-22; p. 50. If Brown had claimed that the March 9 injury was an aggravation of a pre-existing injury, Great American would have approved the claim for the March 9 medical and disability payments because it did not question that the injury occurred while he was working on March 9. *Id.* at p. 52, lines 19-25; p. 53, lines 1-9; p. 54, lines 1-6. Whether there had been a pre-existing condition would not have altered that decision. However, Brown did not inform Great American of any pre-existing injury when he presented his claim.

Following the March 9 shoulder injury, Brown went to the emergency room at Liberty Hospital in Plattsburg, Missouri, where a CT scan was performed on his cervical spine; it reflected no evidence of a fracture. Degenerative disc changes were, however, again noted. Plaintiff's Ex. 202, p. 55.

On March 12, 2010, Brown was examined again by Dr. Tsirlunikov. Brown did not tell him about the March 9 shoulder injury. Dr. Tsirlunikov tr. test., transcript, p. 82, lines 8-11. Dr. Tsirlunikov's examination revealed a decreased range of motion in Brown's right upper extremity, which had not been exhibited in his prior examinations of Brown. *Id.* at p. 84, lines 13-16; p. 85, line 24 through p. 86, line 3. He referred Brown to Dr. Robert Haas, an orthopedist, and also

referred Brown to occupational therapy.  *Id.* at p. 86, lines 16-22.  Brown had no further contact with Dr. Tsirlunikov.

Webster assisted Brown in completing the paperwork associated with his first examination by Dr. Haas on March 17, 2010, and she reported that Brown injured his right shoulder and arm while dollying down the trailer of his truck on March 10, 2010.  Plaintiff's Ex. 202, p. 158.  When asked if Brown had received previous treatment for right shoulder and arm pain, Webster reported he had not, and added that he had received treatment for cervical disc damage resulting from an August 28, 2009 accident.  *Id.*  Dr. Haas's treatment notes reflect that Brown told him he had previously had a problem with his right shoulder, but it had resolved prior to the March 9 incident. Plaintiff's Ex. 202, p. 156.  Brown told Dr. Haas that, while dollying down the trailer on March 9, he developed the sudden onset of localized right shoulder pain, describing the pain as made worse by any motion, including reaching, lifting or rotation of the shoulder.  *Id.*

After examining Brown, Dr. Haas believed he had an acute sprain or strain of the shoulder muscle, which Dr. Haas described as  generalized muscle soreness.  Haas tr. test. by depo., p. 25. He also believed Brown had signs of an impingement syndrome, which he explained means some inflammation of the rotator cuff, which is the ligament that raises the arm.  *Id.*  Based on Brown's explanation of the sudden onset of pain in his shoulder, Dr. Haas concluded his muscle inflammation was acute, meaning that it was a sudden new pain resulting from the March 9 incident.  Dr. Haas said Brown told him he had previously hurt his shoulder in an accident, but it had "resolved until the day that he was cranking the wheels."  *Id.* at p. 28.  As a result, Dr. Haas concluded the muscle strain and inflammation in Brown's shoulder were caused by the cranking down of the trailer on

March 9.  *Id.*  Dr. Haas also testified that Brown's MRI reflected a genetic impingement in his shoulder bone plate, which can interfere with the shoulder muscles and ligaments and cause rotator cuff inflammation.  Dr. Haas deposition, p. 87.  According to Dr. Haas, although it is conceivable that a rotator cuff could be torn as a result of  blunt trauma, the "great majority" of cases do not occur with acute injury, but are chronic.  *Id.,* p. 88*,* lines 8-18.

Brown underwent shoulder injections, physical therapy, and diagnostic testing.  Dr. Haas then referred Brown to Dr. Santosh George, an orthopedic surgeon.   Ultimately, Dr. George performed surgery on Brown's right shoulder on August 20, 2010.  Dr. George did not believe that Brown's shoulder condition was caused by trauma; instead, he believed it was caused by a genetic impingement issue.  Dr. George's tr. test. via depo.,  transcript at p. 33, lines 2 through 21.   As Dr. George explained the condition in layman's terms, Brown had a genetic bone hook inside his shoulder, and it decreased the amount of clearance for the rotator cuff tendon to move back and forth. *Id.* at p. 92, lines 17 through 20. After the surgery, Dr. George performed a physical exam on Brown,  and observed that Brown again had full range of motion in his right upper extremity.  Dr. George's tr. test.,  transcript, p. 35, lines 22-25. Brown told Dr. George on September 30, 2010 that "he [was] very pleased as far as the outcome of the operation."  *Id.* at  p. 38, lines 4-14. Brown participated in post-surgery physical therapy until October 26, 2010. Plaintiff's Ex. 202, pp.156-163, 181-183, 186, and 187.

 Brown's last appointment with Dr. George was on November 1, 2010, and Dr. George released Brown to return to work on November 10.   Dr. George did not see Brown again after that date, and was not aware that Brown continued to complain of shoulder problems. Dr. George tr.

test., transcript, p. 46, lines 3-7.

After Dr. George determined Brown had reached maximum medical improvement in relation to his right shoulder and released him to work without restrictions, Great American terminated Brown's occupational accident benefits. Phyllis Hunter tr. test., transcript at p. 106, lines 7-19. Shortly thereafter, however, Brown asked that his claim with Great American be reopened because he had also injured his neck during the March 9, 2010 incident. *Id.*; Defendants' Ex. 2I, pp. 28, 33-35, and 57.   Brown did not state that the March 9, 2010 injury to his neck was related to any prior accident.  *Id.*

As a result of Brown's request to reopen the March 9 claim, Great American arranged for an independent medical examination to determine if  Brown's claim should be reopened.  He was examined by Dr.  Kala Danushkodi, who reviewed his medical records, including the MRIs, the EMG, and the x-rays; she agreed with the previous medical diagnoses of degenerative disc disease and probable carpal tunnel syndrome.  Danushkodi tr. test. by depo., pp. 12-14; p. 20, lines 16-25; pp. 22-24.  She reviewed the records related to his 2010 shoulder surgery.  *Id.* at p. 26.  She concluded that his shoulder injury was the result of the March 9 incident.  *Id.*  Based on her examination of Brown and the medical records, she believed that he might have cervical radiculopathy, but she could not determine whether it was the result of degenerative disc disease or a trauma.  Dr. Danushkodi concluded that Brown's continuing shoulder and neck complaint was possibly the result of impingement caused by post-surgery adhesions or scarring of the rotator cuff muscles, that he should be further evaluated, and that he could not at that time return to work as a truck driver.  *Id.,* pp. 58-59; 85-86.

Based on Dr. Danushkodi's examination, Great American reopened Brown's claim for injury resulting from the March 9 incident.  Brown was  referred to the University of Kansas Medical Center for a right shoulder x-ray, MRI, and arthrogram during the time period between January and March 2012.  Great American paid  these medical expenses because they were related to the March 9, 2010 work injury.  Defendants' Ex. 2I, pp. 62-63.   Great American  also provided Brown lost income benefits from March 10, 2010 until when he was released by Dr. George to return to work on November 10. Plaintiff's Ex. 202 pp. 178-179. The payments representing lost income totaled $13,456.08. Defendants' Ex. 2I, pp. 63-64.  Great American also paid $29,267.57 between April 16, 2010 and April 25, 2012 for Brown's medical bills associated with his March 2010 shoulder injury. *Id.* at pp. 62-63.

The only medical expenses incurred by Brown which were not paid by Great American during this time period were the December 15, 2010 ambulance and emergency room charges, and July 5, 2011 treatment and diagnostic tests.  Defendants' Ex. 2I, pp. 62-63.  The December 15 ambulance and emergency room expenses were incurred when Brown sought emergency treatment, complaining of a headache on his left side, blurred vision in his left eye, and radiating pain across his head to his right side, extending to his leg.  He also had chest pain.  Plaintiff's Ex. 202, pp. 338-350.   According to the evidence, these specific physical complaints had not been reported to Brown's physicians during any previous examination or treatment from August 28, 2009 to December 15, 2010.  Plaintiff's Exs. 202-203.

Great American also did not pay expenses related to Brown's July,  2011 treatment at the Plattsburg Medical Clinic, where he was diagnosed with bronchitis.   After Brown received

medication and additional treatment, the Clinic determined the bronchitis was cleared on August 19, 2010.  Plaintiff's Ex. 202, p. 38-40.

The evidence reflects that Brown received no medical treatment from December 15, 2010 through July 5, 2011.  Plaintiff's Exs. 202 and 203.

In calculating his damages for medical expenses previously incurred and claimed as caused by the August 28, 2009 accident, Brown seeks a total of $72,758.28 incurred as of February 20, 2012.  Plaintiff's Ex. 70.  Approximately $28,443.43 of this amount was incurred between August 28, 2009 and March 10, 2010.  *Id.*

The evidence shows that, after the March 9, 2010 incident in which he injured his shoulder and for which surgery was later performed, Brown has never returned to work.

During the pendency of this lawsuit, Brown was examined by a new physician, Dr.  Steven Simon, at the request of Brown's attorney.  His first examination by Dr. Simon was on February 17, 2012.  During the examination, Brown advised Dr. Simon of numerous physical complaints he was experiencing at that time.  He said his jaws popped, and he had ringing and congestion in his ears, and fluid in his ears.  He also reported that his legs felt rubbery and spongy, and would not always hold him up.  He also told Dr. Simon that he dropped things, had severe headaches, and had lost consciousness on two occasions.  He reported weakness in his arms and numbness from his shoulder to his hands, in particular his thumb and next two digits.  Brown also reported decreased sensation in his neck as well as significant pain, and a burning sensation along the back of his skull and extending down to his ribs.  Brown reported  low back pain, with  sudden sharp pains in his back involving areas of his spine, and he described these as feeling as though someone was hitting him

20

with a board.  He also said he was occasionally "foggy headed," had some problems with his memory, and was experiencing "visual changes."  Plaintiff's Ex. 129, p. 2; Dr. Simon tr. test.  Dr. Simon noted that Brown admitted to smoking, but stated he was trying to quit.  Brown denied having any systemic diseases.  *Id.*

Dr. Simon  reviewed the records of Brown's treating physicians during the time period of October 2009 through December 15, 2010, including x-rays,  MRIs, and CT scans.  Plaintiff's Ex. 128.   He performed a physical examination directed at testing Brown's grip strength and range of motion in his upper and lower extremities. Dr. Simon noted Brown's jaw misalignment, and also concluded he has altered range of motion in his cervical spine, an abnormal gait, and his medical records indicate carpal tunnel syndrome.  He also performed tests designed to show cognitive levels, including memory, and ability to write.  Plaintiff's Ex. 129, p. 3.

Based on his review of the medical records and his February 17, 2012 examination, Dr. Simon opined that Brown had sustained a severe concussion in the August 28, 2009 accident, and that it resulted in a shearing injury to his brainstem.  *Id.*

Dr. Simon was initially contacted by Brown's attorney to serve as an expert witness.  Dr. Simon tr. test.  In May of 2012, Dr. Simon reported to the attorney that Brown asked him to treat Brown for his "continuing, ongoing pain and decreasing emotional control."  Plaintiff's Ex. 130. Dr. Simon prescribed medications for both pain and depression.  *Id.*  He noted that Brown had taken Dr. Simon's previous advice to obtain a cane to assist with balance and walking.  *Id.*

Dr. Simon performed a May 24, 2012 physical examination, which resulted in essentially the same findings as were reflected in his February, 2012 examination.  Plaintiff's Ex. 130.  Dr.

Simon noted, however, that Brown reported a new problem with dizziness. Dr. Simon prescribed medication for dizziness. *Id.*

Dr. Simon opined that Brown sustained significant injuries to various parts of his body as a result of the August 28, 2009 accident. Opining that Brown suffered a concussion resulting in brain stem shearing, Dr. Simon also believes Brown sustained whole body injuries, including damage to discs in his cervical and thoracic spine, carpal tunnel syndrome, and cervical injury which caused misalignment in his jaw. Dr. Simon believes that, as a result of these injuries, Brown has sustained nerve damage which has adversely affected his gait and caused significant pain throughout his upper and lower extremities. According to Dr. Simon's opinion, Brown also suffers from chronic pain syndrome, and he believes this is the result of the August 28, 2009 accident. Dr. Simon has concluded that Brown will require medical care, including possible surgery, to treat some of these conditions, and that his physical impairments will continue to require medical care for the remainder of his life. Dr. Simon also believes that Brown's symptoms of depression are caused by chronic pain and that this, too, is the result of the accident. Dr. Simon concludes that Brown will also require psychiatric or psychological treatment or counseling for an indefinite future time period. Although Dr. Simon concludes that Brown will never be able to work, he believes Brown will require occupational therapy to assist with his physical limitations. Dr. Simon tr. test.

Dr. Simon testified that he reached his conclusion that Brown is disabled for the remainder of his life after spending approximately one to one and one-half hours with Brown. Dr. Simon tr. test. He acknowledged that no other physician treating Brown since August 28, 2009 has reached the same conclusion. He concluded that Brown's current condition was caused by the August 28,

2009 accident because Brown's medical records prior to that date did not reflect any symptoms or conditions of neck, back, or shoulder problems.  When asked about the conflicting testimony of other examining physicians who opined that Brown's disc deterioration was degenerative rather than caused by trauma and that his shoulder condition was genetic or arthritic and not trauma-related, Dr. Simon disagreed.  *Id.*  He testified that he based his opinions regarding the force which resulted from the impacts during the August 28, 2009 accident on Brown's description.  He also based his opinions in part on Brown's description of the portions of his body which were impacted, and he testified that Brown told him he hit his head during one of the impacts. *Id.*  Dr. Simon agreed, however, that Brown's carpal tunnel syndrome could cause the numbness that Brown experiences in his extremities, and he also agreed that carpal tunnel syndrome is not related to brain stem shearing which Dr. Simon believes occurred on August 28, 2009, nor is it the result of any other injury sustained in that accident.

Dr. Richard Dubinsky, a certified neurologist retained as an expert witness for Defendants, opined that the medical evidence does not support Dr. Simon's conclusion that Brown suffered brain stem shearing in the August 28, 2009 accident.  He testified that he has experience in diagnosing and treating brain stem injuries, and Brown's medical history does not reflect the symptoms associated with brain stem shearing.  Dr. Dubinsky testified that, based on the medical evidence in the time period shortly after the accident, Brown's symptoms indicated a possible mild concussion.  He noted that there is no evidence of a severe concussion that could have caused brain stem shearing. Evidence of brain stem shearing typically includes a coma.  Moreover, for such an injury, an examination should, at a minimum, show evidence of severe alterations in brain functioning;

symptoms would include spasticity, loss of coordination, lack of control of eye movement,  loss of sensation, light sensitivity, and amnesia.  Dr. Dubinsky tr. test.  According to Dr. Dubinksy, such symptoms would occur immediately after a traumatic injury, and Brown had none of these conditions immediately after August 28, 2009.  To the extent that Brown has reported loss of coordination and problems with balance, he did not do so until long after the accident.

With respect to Brown's contention that he incurred cervical spine injuries as a result of the accident, Dr. Dubinsky noted that x-rays and CT examinations of his cervical spine showed essentially the same results in 2009, 2010, and 2011.  Dr. Dubinsky tr. test. According to Dr. Dubinsky, these results are significant because there is no real change in his cervical spine condition over this period of time.  Had a traumatic injury damaged his cervical spine, there would be evidence of changes over this time period.

With respect to Brown's increasing complaints of shoulder and limb pain over the period of two to three years, Dr. Dubinsky believes the medical evidence reflects that this is the result of a chronic condition rather than an acute condition caused by trauma from an accident.

Dr. Dubinsky agrees with the opinions of treating physicians that Brown has carpal tunnel syndrome.  He agreed with Dr. Malik's assessment of the October 2009 EMG test on Brown, which reflected possible carpal tunnel syndrome, a condition that is chronic rather than acute.   Other medical records, including those of Dr. Simon, also indicate that Brown has carpal tunnel syndrome. According to Dr. Dubinsky,  this condition can be treated with wrist splints, muscle relaxants or, if necessary, surgery.  He also finds no evidence of acute cervical radiculopathy, as the EMG results did not evidence this condition.  Instead, Dr. Dubinsky agrees with Dr. Malik that the EMG reflects

chronic degenerative disc disease, and sees no evidence of acute injury.

Dr. Dubinsky also examined Brown, and noted Brown listed at least 14 complaints about pain throughout his body. Dr. Dubinsky tr. test. Dr. Dubinsky explained that he administered a series of tests designed to measure specific physiological conditions which could indicate brain stem injury or injury to the central nervous system. He concluded that Brown lacked symptoms consistent with any neurological injury. For example, he noted that Brown has no complaints of deficits in concentration or attention, no altered vision, no issues with speaking or swallowing, no dermatomal patterns in his skin, and he has not experienced any signs of amnesia. Brown's sense of smell was not altered, his visual acuity and pupil reaction were normal, as were his optic nerve and retina. Brown's facial sensations were normal on both sides, there was no weakness or deviation in his mouth and jaw, and no evidence of TMJ. His coordination was normal, although he needs the assistance of a cane for stability and tends to favor his right leg while walking. The normality of these functions indicates there is no brain injury. *Id.* Dr. Dubinsky's assessment of Brown's mental status was based on their conversation and Brown's responses to questions; all these were normal. Based on Brown's testimony in his deposition that he had hit his head during the August 28, 2009 accident, Dr. Dubinsky opined that Brown may have suffered a concussion. However, he found no evidence of central nervous system injury or cervical radiculopathy, and no evidence of brain stem shearing or other injury to the brain stem.

In connection with his role as expert witness for Brown, Dr. Simon also referred Brown to Tracy Wingate, a board-certified occupational therapist and certified life care planner. According to Ms. Wingate, Brown's attorneys retained her to develop a life care plan for Brown. She testified that the purpose of the plan is to assist an individual with ongoing medical needs and other forms

of supportive care, including but not limited to physical therapy and pain control. She developed such a plan for Brown on June 27, 2012. Plaintiff's Ex. 142.

According to Ms. Wingate, the life care plan she prepared for Brown was based primarily on information she obtained from Dr. Simon regarding Brown's medical condition and future medical needs, including possible surgery, medications, physical therapy, and other treatments Dr. Simon believed would be necessary. In addition, Ms. Wingate reviewed the medical records of Brown's providers from August 28, 2009 through his examination by Dr. Simon in 2012. She also reviewed Brown's deposition in this lawsuit, and she attended Brown's June 21, 2012 appointment with Dr. Simon. Plaintiff's Ex. 142, p. 2. Based on Dr. Simon's diagnosis of chronic pain syndrom caused by a brain stem shear, Ms. Wingate concluded that Brown's prognosis is "grim." *Id.* at p. 5.

Based on standard tables of accepted life expectancy estimates, Ms. Wingate determined that Brown's life expectancy was 34 years beyond his 2012 age of 44 years, and the determination that Brown's life expectancy is normal was based on Dr. Simon's opinion. Wingate tr. test. Although she is aware that Brown is a smoker, she testified that the life expectancy tables she utilized did not include any differentiation between smokers and non-smokers. *Id.* The various treatment procedures, and the number and frequency of procedures, needed by Brown was based on Dr. Simon's recommendation. Plaintiff's Ex. 142, pp. 8-10. At her request, Dr. Simon completed a form questionnaire utilized by Ms. Wingate for the purpose of preparing a life care plan. Plaintiff's Ex. 143. Dr. Simon's responses were the sole basis for her inclusion in Brown's life care plan of the current and projected future necessary medical procedures. Wingate tr. test. According to Ms. Wingate, she accepted as true all of Brown's statements regarding his injuries in the August 28,

2009 accident as well as his description of his physical and mental condition.  *Id.*  Because she is not a medical doctor, she does not attempt to independently evaluate a person's physical condition, and she relies on the person's medical provider to make that assessment.  *Id.*  In this case, she reviewed Brown's prior medical records and selected those portions which she found important. Wingate tr. test.  However, she relied primarily on Dr. Simon's assessment of Brown's current condition and future medical needs.  *Id.*  She acknowledged that none of Brown's treating physicians other than Dr. Simon had opined Brown would require jaw surgery, pain management therapy, chiropractic care, or counseling; she also acknowledged that no other treating physician had diagnosed a brain stem injury or post-concussion syndrome.  Wingate tr. test. Ms. Wingate testified it is possible that some of the future treatment listed in Brown's life care plan will not be necessary, but she includes in the plan she develops items that are probable.  She relied on Dr. Simon's opinion to select such items for Brown, and testified that the life care plan for Brown would have to be altered if Dr. Simon's opinions are incorrect.  *Id.*

In addition to medical and psychological care based on Dr. Simon's assessment of Brown's current and future needs, Ms. Wingate included in the life care plan costs associated with household services for the remainder of Brown's life.  Plaintiff's Ex. 142, pp. 17-18.  His projected daily needs were based on Ms. Wingate's interview with Brown and Webster regarding daily activities and his ability to perform certain tasks.

Ms. Wingate also prepared a financial analysis of the costs associated with the life care plan she developed for Brown.  Plaintiff's Ex. 142, pp. 11-22.  The grand total of all expenses is $837,705.99. *Id.* at p. 22. This does not include a calculation for loss of earning capacity.  *Id.*  Ms. Wingate testified that the amounts reflected for each treatment, procedure, fee for service, and

related expenses are based on average costs derived from various accepted sources she utilizes in the course of her standard work as a life care planner.  Wingate tr. test.

Larry Cox, an economist serving as an expert witness for Brown, prepared an analysis of the economic losses which Brown claims to have incurred as a result of the injuries sustained in the August 28, 2009 accident.  Plaintiff's Ex. 160.  Brown's claimed losses include past lost wages from the date of the accident to the April 22, 2013 trial date, as well as future lost earnings capacity, reduced to present value.  Plaintiff's Ex. 160, p. 8.  Cox also included the costs of the life care plan prepared by Ms. Wingate,  and he reduced the costs of future expenses to present value.  Plaintiff's Ex. 162.  He then combined all past and future economic losses in all categories to calculate the total economic loss which Brown claims resulted from the injuries sustained in the August 28, 2009 accident.

With respect to the damages for past lost wages from August 28, 2009 to the date of trial, Cox acknowledged that there is limited information on which to base what Brown would have earned under the Crosswinds contract with Rush during this time period.  Cox tr. test. This is because Brown worked for only a few weeks after the contract was executed.  According to Cox, he used the records of Rush for the time period when Brown worked during January through March of 2010 to determine Brown's earnings; those reflect an average of $420 per week, which would result in an annualized amount of $21,000, assuming that Brown had earned that same amount for each week from August 28, 2009.  Cox tr. test.  Cox calculated, based on that assumption, Brown's lost earnings for the time period of August 28, 2009 to April 22, 2013 were $76,096.[6]

---

[6]This amount excludes the earnings of Brown from January 27, 2010 through March 10, 2010, when he was working and earned income from Rush.  *See* Plaintiff's Ex. 160, p. 3 at n. 1.

Cox also reduced to present value the $837,705.99 estimated cost of Brown's life care plan, as calculated by Ms. Wingate.  According to Cox, the present value of the plan is $793,823. Plaintiff's Ex. 162.

To determine Brown's future economic losses, Cox used the time period of the trial date through the date on which Brown would reach the age of 67 years, which is the earliest date on which he could receive full Social Security retirement under current Social Security regulations. Cox tr. test.  Brown will reach  age 67 on November 22, 2034.  Plaintiff's Ex. 160 at p. 3.   To determine future earnings to that date, Cox performed two calculations, which he labeled "models." Model #1 is based on Brown's actual annualized earnings  estimate for 2010 according to the amount he earned with Rush, and Model #2 is based on the average annual income of heavy truck drivers in the Kansas City, Missouri metropolitan area, which includes Brown's residence in Plattsburg and Rush Trucking's office in Claycomo.  Cox tr. test.  The data for Model #2 was obtained from the Bureau of Labor statistics.  *Id.*

Under Model #1, Cox calculated Brown's future earnings loss as $451,903, while Model #2 resulted in a loss of $871,203.  Plaintiff's Ex. 161.  Both amounts are reduced to present value.  *Id.* Adding the $793,823 present value calculation of the life care plan and the past earnings loss of $76,096, Cox calculated a total amount of past and future economic damages as $1,321,822 under Model #1, and $1,741,122 under Model #2.  Plaintiff's Ex. 161.

Cox testified that none of the past and future economic loss calculations include any deduction for the costs associated with Brown's ownership of Crosswinds.  For example, he made no deduction for payments on the amount owed on the Freightliner truck, maintenance costs for the truck, or other expenses.  He did not do so because he had no information regarding those expenses.

Cox tr. test.  In calculating the earnings of Brown, he assumed that Brown and Crosswinds were the same, and thus attributed all earnings of Crosswinds to Brown.  *Id.*  He did not consider  the fact that Webster was the co-owner of Crosswinds, and would be entitled to some portion of the amount of income derived from its contract with Rush or other future income that might be earned by Crosswinds.  According to Cox, Webster's entitlement to a portion of Crosswinds's earnings presented a legal question he was not asked to consider.  Cox tr. test.

Cox did not rely on income tax returns to perform his calculations, as he believes it is difficult to predict taxable income for a small proprietorship due to uncertainty in the amount of deductions for depreciation and other factors.  *Id.*  However, he testified that the 2007 and 2008 tax returns for Crosswinds would show a higher annual income than the $21,000 he used as the basis for his calculation of Brown's past lost income.  *Id.*; 2007 and 2008 tax returns, Plaintiff's Ex. 164, pp. 125, 151, and 153.

Cox testified that his calculations regarding lost future earnings were based on the fact that Wilbur Swearingin testified Brown is totally disabled and will never be able to return to work in any employment.  Cox also confirmed that, in calculating future losses associated with the life care plan prepared by Wingate, he relied completely on the contents of her plan and the items of costs she included as necessary for Brown's future medical and personal needs.  Cox tr. test.

Wilbur T. Swearingin, a Certified Rehabilitation Counselor testifying as an expert witness for Brown, opined that Brown is permanently and totally disabled and will not be placeable or employable in the labor market.  Swearingin tr. test. by deposition, pp. 54-56; Swearingin expert report, Plaintiff's Ex. 148.  Swearingin testified that he based this opinion on his review of Brown's medical records, his interview with Brown, and the results of tests he administered to Brown.

Swearingin testimony.   Three tests were used by Swearingin: 1) the Functional Capacity Checklist ("FCC"), which is completed by the individual being tested and measures the individual's personal perception of his physical limitations; 2) the Wide Range Achievement Test 4 ("WRAT-4"), which measures basic academic skills in word reading, spelling, and math computation; and 3) the Career Occupational Preference System ("COPS"), which measures the individual's occupational interests. Plaintiff's Ex. 148, pp. 5-6;11-12.

The WRAT-4 test results reflect that Brown has fourth grade reading skills, third grade spelling skills, and math computation skills at the fourth grade level.  Plaintiff's Ex. 148, p. 11. According to Brown, he completed the eighth grade, and he thinks he may have obtained a GED evidencing he passed a high school equivalency examination, but he is uncertain.  Swearingin tr. test., p. 19, lines 14-22.

His responses to the FCC reflect that his perception of his functional capacity is extremely low.  Rating various categories of physical abilities, Brown marked 88 of 165 items on the checklist as activities which are "[i]mpossible to do or can do only with great pain."  He marked  others as "very difficult to do."  Plaintiff's Ex. 148, p. 7.  Based on this information, Swearingin described Brown as having a profile of profound, severe disability.  *Id.*  Although Swearingin explained that the answers on the FCC checklist were marked by Brown, he testified that the individual's perception of his physical limitations is important in assessing his vocational skills because an individual will not perform tasks which he thinks he cannot perform, even if medical evidence is to the contrary.  Swearingin tr. test., p. 36, line 1 through 39, line 6.

The COPS test, which also consisted of questions to which Brown marked answers, is designed to measure an individual's occupational interests.  Swearingin tr. test., p. 21, line 7-25, p.

22, lines 1-3.  Brown's answers reflect that his occupational interests are primarily limited to physical work which Swearingin believes Brown is unable to perform.

Swearingin also interviewed Brown regarding his daily activities.  He did so because one of the items he considers is whether the individual is able to take care of himself, as that is a factor in determining whether the individual can perform the physical activities required of working.  According to Swearingin, Brown reported that he is able to dress, bathe, and take care of his personal hygiene needs, and he can feed himself and prepare a simple meal such as a sandwich, and wash his dishes.  Swearingin tr. test., p. 27-28.  He also reported he could sweep and use a vacuum cleaner for short periods, do his own laundry, and perform limited household chores.  *Id.*, p. 29.  He is unable to mow the lawn, but is able to tend a small garden to a limited extent.  *Id.*

Swearingin applied his findings regarding Brown's physical limitations to Department of Labor publications defining categories of work and describing the physical requirements of those categories, the Vocational Expert Handbook published by the Department of Health and Human Services, and the Dictionary of Occupational Titles.  Plaintiff's Ex. 148.   Swearingin concluded that, given his physical restrictions, Brown cannot perform the physical requirements of his former position as a truck driver or his previous work in construction.  Swearingin also ruled out sedentary jobs because the resources he consulted reflect that most sedentary jobs requiring minimal physical exertion also require academic abilities which Brown cannot satisfy with his limited reading and math skills.  He further concluded that Brown has no transferable skills that would render him employable in other positions requiring limited physical exertion.  Given Brown's academic test results, Swearingin concluded that Brown is not a candidate for adult education or training.  Plaintiff's Ex. 148, pp. 14.

Swearingin testified that his assessment of Brown's physical limitations was based primarily on Brown's description of severe pain throughout his entire body, and Swearingin did not attempt to administer any physical tests.  Swearingin tr. test., pp. 25, lines 17 through 27, lines 6-7. Swearingin did review documents reflecting Brown's medical treatment, and he focused on diagnoses which he thought were pertinent to his evaluation of Brown's ability to work, which he included in his expert report.  Swearingin tr. test, p. 32, lines 21 through p. 33, lines 1-3.  He acknowledged that he failed to include in his report the fact that Dr. Santosh George had released Brown to return to work following his August 20, 2010 shoulder surgery.  *Id.* at p. 35, lines 10-16.

III.  Principles of Law and Conclusions of the Court:

The Court has subject matter jurisdiction based on diversity of citizenship of the parties.  The parties have stipulated that the Court has personal jurisdiction over the defendants, that service of process was proper, and that the corporate defendant, USA Truck, has been sued in its proper corporate name.

Because Watkins admits that he caused the August 28, 2009 accident, the only issues are the scope of the injuries Brown sustained in the accident and the amount of damages which Brown may recover.  There is no contention that Brown was negligent or at fault in any manner in causing the accident.

The parties agree that this dispute is governed by Oklahoma law.  Accordingly, the scope of recovery is as follows:

> [R]ecovery may be had for all natural and proximate consequences of the defendant's wrongful act or omission, such as pain and suffering, including future pain and suffering, loss of time and earning capacity, loss of profits, ill-health or disability naturally resulting from the...injury, subsequent aggravations of the injury proximately traceable to the original wrong, and any other damage that can

reasonably be said to have followed as the proximate consequence of the injury received.

*Shebester, Inc. v. Ford*, 361 P.2d 200, 202-03 (Okla. 1961); *see also Strader-Faiazi v. Edmond Fourth of July Festivals,* 28 P.3d 1161, 1163 (Okla. Civ. App. 2001).

Recoverable damages in a tort action consist of "the amount which will compensate for all detriment proximately caused" by the tortious conduct.  Okla. Stat. tit. 23, § 61.  "A plaintiff cannot recover for negligence unless it was the proximate cause of the injuries for which the plaintiff seeks compensation."  *Jones v. Mercy Health Center, Inc.*, 155 P.3d 9, 14 (Okla. 2006).  Oklahoma defines proximate cause as that "which in a natural and continuous sequence, unbroken by an independent cause, produced the event and without which the event would not have occurred."  *Lockhart v. Loosen*, 943 P.2d 1074, 1079 n. 14 (Okla. 1997).

"'The proximate cause of any injury must be the efficient cause which sets in motion the chain of circumstances leading to the injury; if the negligence complained of merely furnishes a condition by which the injury was possible and a subsequent independent act caused the injury, the existence of such condition is not the proximate cause of the injury.'"  *Pepsi-Cola Bottling Co. v. Von Brady*, 386 P.2d 993, 997 (Okla. 1964) (quoting *Booth v. Warehouse Market*, 286 P.2d 721, 723 (Okla. 1955)).

A plaintiff bears the burden of proving his damages by a preponderance of the evidence.  Under Oklahoma law, a preponderance of the evidence is also described as "the greater weight of the evidence," and is defined as evidence which is more probably true than not true.  *See, e.g. Badillo v. Mid Century Insurance Co.,* 121 P.3d 1080, 1096 n.8 (Okla. 2005).

A plaintiff may recover only those damages which are ascertainable and not based on

speculation.   "Damages, to be recoverable, must be susceptible of ascertainment in some manner other than by mere speculation, conjecture or surmise, and by reference to some definite standard." *Lippitt v. Farmers Ins. Exchange,* 233 P.3d 799, 802 (Okla. Civ. App. 2009) (citing *Great Western Motor Lines, Inc. v. Cozard*, 417 P.2d 575, 578 (Okla. 1966)). "A person who has received an injury due to the negligence of another is entitled to recover all damages proximately traceable to the primary negligence including subsequent aggravation which the law regards as a sequence and natural result likely to flow from the original injury even though there may have been some intervening cause contributing to the result." *Johnson v. Mid-South Sports, Inc.*, 806 P.2d 1107, 1115 (Okla. 1991)(quotation omitted).

An injured plaintiff may also recover damages for "future loss caused by a wrongful act provided the damages are reasonably certain to occur." *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 725 (10th Cir. 1993) (citing Okla. Stat. tit. 23, § 5).   With respect to future business losses, the "anticipated profits of a commercial business or other like business, are ordinarily too speculative to warrant recovery for their loss." *Lippitt v. Farmers Ins. Exchange*, 233 P.3d 799, 803 (Okla. Civ. App. 2009).   However, such future losses may be recovered as an element of damages where they are established, "'not by guesswork, conjectures, uncertain estimates, nor mere conclusions, but by tangible facts, from which actual damages may be logically and legally shown or inferred.'" *Id.* (quoting *Bokoshe Smokeless Coal Co. v. Bray,* 155 P. 226, 229 (Okla. 1916)).   "In other words, anticipated profits from an established business may be recovered where the amount of loss can be shown with reasonable certainty and/or by just and reasonable inference." *Lippitt*, 233 P.3d at 803 (citing *Florafax International, Inc. v. GTE Market Resources, Inc.*, 933 P.2d 282, 293 (Okla. 1997)).

A plaintiff prevailing in a tort action may also recover damages for pain and suffering caused

35

by the negligent conduct. *See, e.g., Shebester*, 361 P.2d 202-03. Damages for pain and suffering and similar claimed losses "are general in nature and are elements which cannot be fixed with an exact amount." *West v. Board of County Commissioners of Pawnee County*, 273 P.3d 31, 36 n. 17 (Okla. 2011) (citing *Government Employees Ins. Co. v. Quine*, 264 P.3d 1245, 1247 n. 2 (Okla. 2011)). "Proving the precise amount of such damages is, by their very nature, almost impossible." *West*, 273 P.3d at 36 n. 17 (citing *Browning v. Ray*, 440 P.2d 721 (Okla. 1968)). When there is no identifiable measure of damages, they are properly determined by the trier of fact according to "the judgment and opinion of a reasonable person." *Id.* (citing *Hornstein v. Yarrington*, 237 P. 73 (Okla. 1925)).

Based on all the evidence before the Court, including the testimony of both parties' expert witnesses, the Court concludes that there is insufficient evidence to support the degree of physical harm currently described by Brown as having occurred during the August 28, 2009 accident. The evidence reflects that Brown's current testimony and his 2012 explanation to Dr. Simon describe significantly more impact and physical movement than he had described in his reports to physicians soon after the accident. Brown's trial testimony and statements to Dr. Simon also describe impacts to portions of his body, including his head, which were not previously reported to his medical providers. Although the evidence shows that he experienced physical movement within the cab of his truck from the impacts, his description of being thrown around the interior of the sleeping area with significant force is not supported by a preponderance of the evidence.

There were inconsistencies in the testimony of both Brown and Watkins regarding the number of impacts occurring during the August 28, 2009 accident. Based on all the evidence, including that of Officer Chavez and both parties' expert witnesses, the Court concludes that a

36

preponderance of the evidence establishes that there were three low-speed impacts to Brown's vehicle, which resulted in relatively minor damage to the front driver-side area of the vehicle.

There is conflicting evidence regarding the speed of Watkins's vehicle at the time of the accident.  However, the Court concludes that the preponderance of the evidence, including the testimony of the parties' respective experts, shows that Watkins was traveling at a very slow speed at the time of impact, and likely slower than normal walking speed.

There is also insufficient evidence to establish, by a preponderance, that the cab of Brown's vehicle was subject to significant side-to-side movement.  Although Brown's expert witness, Mr. Christoffersen, opined that side-to-side movement of the vehicle's cab and sleeping compartment was physically possible, he based that opinion on post-accident re-enactments which involved the placement of force on the sides of the cab area, and there is insufficient evidence that such force occurred during this accident.  The physical evidence of the damage to Brown's truck establishes impacts only to the front section of the vehicle.

Even if the cab sustained both front-to-back and side-to-side movement, the evidence does not support a conclusion that Brown was thrown about the interior in the violent manner he currently describes.  As noted, *supra,* Brown's description of the force resulting from the impacts has been inconsistent, and his description of the force to which he was subjected and the resulting impact to various portions of his body has changed over time.  He currently describes the occurrence as being violently thrown about like a rag doll, but initially told Dr. Daffron that he only hit his right shoulder and neck.  His initial description is consistent with the minor cut to the neck or upper shoulder area for which he was treated at the scene.  It was not until some time later that Brown reported hitting his head after being thrown about inside the sleeping compartment.  There is no medical evidence

that he exhibited signs of any significant injury to his head immediately after the accident.   His medical records also reflect that he has never claimed to have lost consciousness during the accident. Dr. Daffron's initial opinion, which was supported by x-rays and an MRI taken within a few weeks after the accident, was that he suffered muscle spasms and strains in his neck and shoulder.   There was no evidence of any fracture in his neck or shoulder.

Brown has proved by a preponderance of the evidence that he sustained an injury as a result of the August 28 accident.   A preponderance of the evidence establishes that he sustained muscle strains to his neck and right shoulder, but the evidence is insufficient to show that he sustained the degree of acute traumatic injury to his neck, shoulder, arm, or head that he now claims occurred during  the accident.

A preponderance of the evidence also shows that, at the time immediately after the accident, Brown had mild carpal tunnel syndrome in both hands.   However, there is no evidence that this condition was caused by trauma.   Instead, a preponderance of the evidence, including the testimony of his own physicians, reflects that carpal tunnel syndrome is a chronic condition unrelated to the accident.   That he experienced increasing numbness, tingling, and pain in his extremities months after the accident is consistent to some degree with the medical evidence that these are typical symptoms of carpal tunnel syndrome, and the condition usually becomes worse over time.   While the evidence shows Brown  is likely to require future medical treatment for this condition, any costs associated with that treatment are not recoverable as damages in this lawsuit.

The evidence also establishes that Brown has cervical degenerative disc disease and possibly has degenerative disc disease in the lumbar region.   The evidence further establishes that this is a chronic condition typically occurring in individuals in Brown's age group.   The evidence does not

preponderate to support a conclusion that this condition was caused by a traumatic injury such as the August 28, 2009 accident, but it instead develops over time.  The fact that, prior to the August 28, 2009 accident, Brown had not experienced discomfort or pain in the cervical, lumbar, or other areas of his back does not support a conclusion that this condition was caused by the accident.  A preponderance of the medical evidence instead supports the conclusion that it is not uncommon for persons having degenerative disc disease to have no discomfort or pain for a considerable time, as the condition typically becomes progressively worse with the passage of time.  Accordingly, Brown is not entitled to recover damages attributable to current or future medical treatment related to degenerative disc disease.

The evidence is also insufficient to support Brown's contention that his degenerative disc disease was exacerbated by the impacts sustained in the accident.  While there is some medical testimony that an individual having degenerative disc disease could experience a herniated disc as a result of an impact to the body, Brown's medical providers found no evidence following the accident that he had suffered such injury.  Instead, the MRIs and x-rays performed within approximately two months following the accident did not show a significant disc herniation, but consistently reflected degenerative disc disease typical of persons in Brown's age group.

Brown has not proved by a preponderance of the evidence that he sustained injury to his brain stem, or shearing of the brain stem, in the August 28, 2009 accident.   The only medical opinion that such injury was sustained was offered by Brown's expert witness, Dr. Simon, and there is no evidence in the medical records of Brown's treating physicians that would support the existence of a brain stem injury.   There was expert testimony at trial regarding the symptoms of brain stem injury, and Brown's extensive medical records reflect that he did not exhibit those

symptoms in the weeks and months following the accident.  On this issue, and the issue of other, purportedly related neurological abnormalities, the Court finds most credible and persuasive the testimony of Dr. Dubinsky, who found no basis of support for Dr. Simon's diagnosis of brain stem and related injuries.

Brown has proved by a preponderance of the evidence that he incurred expenses for medical treatment and physical therapy during the time period from August 28, 2009 to March 9, 2010 and that these expenses were the result of the accident. These were performed after Brown complained of continuing pain and/or pain in areas of his body which were not initially reported to Dr. Daffron. Although Defendants contend that some of these expenses should not be allowed because the diagnostic results reflected conditions not related to the accident, the Court finds that the various diagnostic examinations during this time period were performed in order to determine the extent of the injuries he may have suffered.  That the examination results do not support a conclusion that he suffered additional injuries does not preclude recovery of the associated costs.  Thus, Brown is entitled to recover $28,443.43 for medical expenses incurred during the time period of August 28, 2009 to March 9, 2010.

The evidence establishes that, by early January of 2010, Brown's pain and other conditions resulting from the August 28 accident had subsided to the point that he wanted to return to work, and he was released to work, without restrictions, on January 18, 2010.  The evidence also establishes that, by early March of 2010, Brown's neck and shoulder pain had substantially resolved, as he reported essentially no pain or minimal pain, and his physical examination displayed a normal range of motion in his upper body and extremities.

On March 9, 2010, Brown injured his right shoulder while dollying down a trailer.  The

evidence establishes that this was an acute injury.  The evidence does not preponderate, however, in support of the conclusion that the March 9 incident exacerbated the shoulder and neck muscle strain caused  by the August 28, 2009 accident. As the Court has concluded,  prior to the March 9 incident, Brown was having no pain or minimal pain in his neck and shoulder, and he had full range of motion. Thus, Brown has failed to show by a preponderance of the evidence that the medical treatment for his March 9 injury, and the resulting expenses, were necessitated by the August 28, 2009 accident.  Accordingly, Brown is not entitled to recover from Defendants damages based on medical expenses during the period after March 9, 2010.

Brown has not shown by a preponderance of the evidence that his August 20, 2010 shoulder surgery was necessitated by an injury caused by the August 28, 2009 accident.  A preponderance of the medical evidence establishes that his shoulder surgery was the result of a genetic bone impingement which interfered with Brown's rotator cuff function, which limited his mobility and caused pain.  While the evidence suggests that Brown's March 9 injury might have exacerbated the existing bone impingement, there is no medical evidence suggesting that the August 28 accident did so.

Based on a preponderance of the evidence, any shoulder and right arm pain currently experienced by Brown were not caused by the August 28 accident.  The medical evidence indicates that post-surgery pain he may be experiencing likely results from ligament scarring or other complication from the August 20, 2010 shoulder surgery.  Although the evidence suggests Brown may require additional medical treatment for his shoulder, including possible surgery, the expenses related to his current and future shoulder treatment are not recoverable as damages attributable to the August 28, 2009 accident.

The evidence does not preponderate to support a conclusion that Brown has experienced cervical radiculopathy caused by the August 28, 2009 accident.  Although there is some medical evidence that radiculopathy, or nerve damage, may be present, there is no supporting conclusive medical diagnosis of that condition.   To the extent there is limited medical evidence that the condition may exist, that evidence does not support a conclusion that it was caused by the August 28 accident.

Nor does the  evidence support a conclusion that Brown's future medical and other needs, as  detailed in the life care plan prepared by Tracy Wingate,  are attributable to injuries caused by the August 28, 2009 accident.  Although some of the future medical treatment included in the life care plan may be required, the evidence is insufficient to show that such extensive treatment was necessitated by the shoulder and neck injury sustained by Brown in the subject accident.  As previously noted, Ms. Wingate substantially relied on the opinions of Dr. Simon when crafting the life care plan.  However, to accept that the extensive physical maladies covered by the life care plan and necessitating future care approaching $1,000,000.00 are causally attributable to the August 28, 2009 accident would require the Court to ignore the opinions of a number of treating physicians and contemporaneous diagnostic tests, in favor of Plaintiff's shifting subjective descriptions of symptoms and pain and the lone opinion of Plaintiff's expert witness, Dr. Simon.  The evidence does not support such a conclusion.

With respect to Brown's claim for damages attributable to his lost income, a preponderance of the evidence shows that, following the August 28, 2009 accident, he was unable to work due to the injury to his shoulder and neck.  There is sufficient evidence of record to show that he was

unable to fully perform the physical requirements of his work as a truck driver during the time period he was undergoing medical treatment, including injections, physical therapy, and diagnostic examinations after August 28. Although the evidence shows that his initial examining physician, Dr. Daffron, directed that he not work for a period of days, there is no evidence that she released him to return to work. Instead, when he continued to complain of pain in his neck and shoulder, she referred him to an orthopedic specialist. As a result, additional diagnostic tests were performed, and additional physical therapy was prescribed. The evidence establishes that he was released to return to work on January 18, 2010, and he began driving for Rush again on January 27, 2010.

The Court finds that a preponderance of the evidence shows that Brown was unable to work during that time period because his medical providers were providing treatment and performing diagnostic examinations designed to determine the extent of the injuries caused by the August 28, 2009 accident. The evidence is sufficient to show that, during this time period, he was unable to fully perform the physical aspects of his job, and was undergoing reasonably necessary medical treatment and diagnosis. Accordingly, the Court finds by a preponderance of the evidence that Brown is entitled to recover damages for lost income during the period of August 28, 2009 to his return to work on January 27, 2010. The Court concludes there is sufficient evidence to show that Rush would have assigned Brown the same number of trips and the same routes during the time period from August 28, 2009 through January 26, 2010 as he was assigned prior to the accident. The income he earned during the brief time period he actually worked for Rush reflects that he would have earned $9,037.74 during this time period. Brown is entitled to recover that amount from Defendants as damages for lost income caused by the August 28, 2009 accident.

The evidence establishes that Brown returned to work on January 27, 2010 and continued to drive for Rush until he sustained a shoulder injury on March 9, 2010.  The evidence also establishes that, following March 9, Brown has never returned to work.  Brown presented evidence that he is currently unable to work and may be totally disabled and unable to work in the future.  However,  as the Court has concluded, the evidence is not sufficient to establish, by a preponderance, that his inability to work after March 9, 2010 and in the future is causally connected to the August 28, 2009 accident.  Therefore, the Court finds that he is not entitled to recover damages from Defendants for lost income from March 9, 2010 to the date of trial, nor is he entitled to recover damages based on future lost income from the date of trial through the remainder of his work life.

With respect to Brown's contention that he is entitled to recover damages for pain and suffering and emotional distress caused by the August 28, 2009 accident, the Court finds that he has shown, by a preponderance of the evidence, that he suffered pain initially and for some time after the accident.  A preponderance of the evidence also shows that, although physical therapy and injections eased his discomfort, he continued to experience pain in his neck and right shoulder until approximately January, 2010, when he reported to both his physical therapist and treating physician that his pain was minimal.  The Court concludes that he is entitled to recover damages for pain and suffering during this period.  A reasonable amount to compensate him in this regard is $20,000.00.

Brown also seeks an award of attorney fees as the prevailing party in this action, and Defendants object, arguing that such fees are not recoverable under Oklahoma law.  Brown argues that he may recover fees pursuant to Okla. Stat. tit 12, § 696.4.   Under Oklahoma law, however,

Brown is not entitled to attorney fees in this case, and the statute on which he relies is inapplicable. The statute does not authorize an award of fees to a prevailing party in any designated type of claim. Instead, it merely sets out filing deadlines for fee applications where the party is statutorily entitled to recover such fees. Nothing in the language of § 696.4 authorizes the recovery of attorney fees to a prevailing party in a claim for personal injury damages.

"In diversity cases, an award of attorneys' fees is a substantive legal issue determined by state law." *Morton v. Progressive Northern Ins. Co.*, 498 F. App'x 835, 842 (10th Cir. 2012) (unpublished) (citing *N. Texas Prod. Credit Ass'n v. McCurtain County Nat'l Bank,* 222 F.3d 800, 817 (10th Cir. 2000)). "'Oklahoma follows the American rule concerning the recovery of attorney fees. It provides that each litigant pay for legal representation and that courts are without authority to assess attorney fees in the absence of a specific statute or contract.'" *G&C Holdings, LLC v. Rexam Beverage Can Co.*, 2013 WL 2321611, at *3 (10th Cir. May 29, 2013) (unpublished)(quoting *Whitehorse v. Johnson*, 156 P.3d 41, 47 (Okla. 2007)). A "cause of action for personal injury would not support an award of attorney fees." *Fletcher v. Monroe*, 208 P.3d 926, 927 (Okla. 2009). The Oklahoma statutes authorize an attorney fee to a prevailing party in an action "to recover damages for the negligent or willful injury to *property*." Okla. Stat. tit. 12, § 940(A) (emphasis added); *Fletcher*, 208 P. 3d at 929. However, "[n]o provision exists for the recovery of attorney fees by a prevailing party for a *personal injury* claim." *Lee,* 990 P.2d at 233 (emphasis added).

In this action, Brown does not seek recovery for any claimed damage to property, and all damages sought are based on personal injuries. Accordingly, fees are not recoverable.

Brown also seeks prejudgment interest on any damages that are awarded. "A federal court sitting in diversity applies state law regarding prejudgment interest." *ClearOne Communications,*

*Inc. v. Chiang*, 432 F. App'x 770, 773 (10th Cir. 2011) (unpublished) (citing *AE, Inc. v. Goodyear Tire & Rubber Co.,* 576 F.3d 1050, 1055 (10th Cir. 2009)).  In this case,  prejudgment interest is authorized by Okla. Stat. tit. 12 § 727.1(E), which allows prejudgment interest on a judgment for personal injury damages.  According to the statute, prejudgment interest accrues 24 months after the suit resulting in the judgment was commenced, and runs to the date judgment is filed in amounts determined in accordance with the statute.  Prejudgment interest shall be included in the instant judgment.

To summarize, the Court finds Plaintiff, Eric Brown, entitled to recover the following damages:

- Medical expenses for services from August 28, 2009 to March 9, 2010 in the amount of $28,443.43.

- Lost wages from August 28, 2009 to January 27, 2010 in the amount of $9,037.74; and

- Pain and suffering from August 28, 2009 to January 18, 2010 in the amount of $20,000.00; and

- Prejudgment interest in the amount of $7.90.[7]

Accordingly, the Court finds that Eric Brown is entitled to judgment as set forth herein.

---

[7]The amount of prejudgment interest is calculated according to the Oklahoma Statute, which provides in pertinent part that prejudgment interest shall not begin "to accrue until twenty-four (24) months after the suit resulting in the judgment was commenced." Okla. Stat. tit. 12, § 727.1(E).  The statute further provides that the interest rate for computation of prejudgment interest shall begin with the rate "which is in effect for the calendar year which is twenty-four(24) months after the suit resulting in the judgment was commenced," and such rate remains in effect "until the end of the calendar year in which interest begins to accrue or until the date judgment is filed, whichever first occurs." *Id.* The file reflects that this action commenced on July 18, 2011.  Thus, prejudgment interest began to accrue 24 months thereafter, on July 18, 2013.  Accordingly, the prejudgment interest rate for calendar year 2013 applies, and continues until the date judgment is entered or the end of calendar year 2013, whichever is earlier.  Judgment is being entered in this case on September 11, 2013.  Thus, Plaintiff is entitled to prejudgment interest at the 2013 rate of  0.09% from July 18, 2013 to September 11, 2013.  *See Notice Re: Postjudgment and Prejudgment Interest,* Oklahoma State Courts Network, January 2, 2013.  The $7.90 in prejudgment interest on Plaintiff's judgment was calculated on a per diem basis from July 18, 2013 to September 11, 2013.

Judgment is hereby entered in favor of Eric Brown and against Defendants in the total amount of $57,489.07.

IT IS SO ORDERED this 11ᵗʰ day of September, 2013.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE